# Nashville, C. & St. L. Ry. Co. *v.* Garth.

*Damage for Injury to Animals.*

(Decided June 29, 1912. 59 South. 640.)

1. *Railroads; Killing Stock; Statute; Application.*—The provisions of section 5476, are applicable only to stock killed or injured in collision with the engine or cars, and are not applicable to stock killed or injured through fright, causing them to injure themselves.

2. *Same; Frightening Animals.*—A railroad company is not liable for injury to animals from fright caused by the operation of a train unless the acts of the company's agents were wanton or malicious. However, where the animal is on the track frightened and running under conditions that indicate that unless the train is stopped, the animal will run into a trestle and be injured, and the danger may be averted by stopping the train, those in charge are bound to stop the train, and if they negligently fail to do so, the railroad is liable.

[Nashville, C. & St. L. Ry. Co. v. Garth.]

3. *Same.*—The evidence in this case examined and held insufficient
to justify a finding that the railroad company was negligent in the
operation of its train, and hence, not responsible for the injury to
the horses caused by jumping into a trestle, there being no actual
collision.

APPEAL from Madison Circuit Court.

Heard before Hon. D. W. SPEAKE.

Action by W. F. Garth against the Nashville, Chat-
tanooga & St. Louis Railway, for damage for injury to
stock by frightening. Judgment for plaintiff and de-
fendant appeals. Reversed and remanded.

COOPER & COOPER, for appellant. Under the evidence
the general charge for defendant might have been given.
—*L. & N. v. Gentry*, 103 Ala. 635; *Wes. Ry. v. Lazarus*,
88 Ala. 453; *Choate v. So. Ry.*, 119 Ala. 614; *A. G. S.
v. Roebuck*, 76 Ala. 277. Trains cannot be operated
without usual noises of the rattling of the cars and
blowing off of steam, and these furnish no presumption
of negligence.—*Stanton v. L. & N.*, 91 Ala. 382; *L. &
N. v. Lee*, 136 Ala. 182. The following cases hold that
under similar facts as the case at bar, a railroad is not
liable.—*Ga. Pac. v. Money*, 8 South. 646; *N. O. & N. E.
Co. v. Thornton*, 3 South. 654. Section 5476, Code
1907, has no application unless there is an actual col-
lision, and hence, charge 5 should have been given.—
*Wes. Ry. v. McPherson*, 146 Ala. 427; *A. G. S. v. Boyd*,
124 Ala. 525. Counsel discuss the other refused charges
in the light of the foregoing authorities and insist that
they should have been given.

WALKER & SPRAGINS, for appellee. The relation of
the owner's negligence to the injury is too remote.—
*A. G. S. v. McAlpin*, 71 Ala. 545; *A. G. S. v. Jones*, 71
Ala. 487; *L. & N. v. Kelcey*, 89 Ala. 387. The evidence
well warranted the finding that the engineer was guilty

of negligence, rendering the defendants liable.—*A. G. S. v. Hall,* 133 Ala. 362; *Chattanooga So. v. Daniels,* 122 Ala. 366; *Chattanooga So. v. Wilson,* 124 Ala. 444. Charge 10 was properly refused.—*E. T. V. & G. v. Bailey,* 74 Ala. 150; 3 Elliott on R. R. sec. 1150. Charge 15 was properly refused.—*R. R. Co. v. Buford,* 106 Ala. 303. There is nothing in the argument against the validity of section 5476, Code 1907, or its applicability to the present case.—*So. Ry. Co. v. Penny,* in MSS.

SIMPSON, J.—This action is brought by the appellee for damages resulting from the fact, as alleged, that the defendant caused 13 colts belonging to the plaintiff to become frightened by an approaching train, thereby causing them to run into a trestle on defendant's road, from which some of them died and others were injured.

The only eye-witness to the occurrence was the engineer, James Barrett, who testifies that the track is straight and the ground pretty level at the place in question, and that there is a fill something like 2, or 2½ feet above the natural surface of the ground; that when he first discovered the colts they were near a gate that opened out from the grazing farm onto a private road, which crosses the railroad about 250 feet from the trestle (or stock gap, as it is sometimes called); that they were 400 or 500 yards from him, bunched together more in a playful mood than anything else"; that the gate was open; that when he first saw them at the gate he applied the emergency brake, also the service brake, which checked the train to some extent. After he traveled a while, they started towards the track, and he applied the emergency brake at once, reversed the engine, pulled open the sand lever, and blew the whistle once; that they were about 500 feet from him when they came

up to the track, and ran north in front of him; that he was traveling about 25 miles an hour, and used all the means known to skillful engineers to stop the train, and did stop it within about 200 or 225 feet of the trestle.

On cross-examination he stated that the function of the service brake is to "just steady the train and get it under control, so I could stop it if I wanted to"; that he could stop the train in about 150 to 200 yards. Putting on the emergency brake had the effect of a sudden stop, jarring and jolting, which would be noticed by a railroad man, but not by a passenger; that, as a general rule, he blew the whistle whenever he saw stock near the track, and they usually went away, and for this reason he blew the whistle when he first saw the colts; they did not seem to be coming towards the track until he blew the whistle, and he then stopped the train as quickly as he could.

The conductor did not see the accident, but testifies to feeling the effect of the emergency brake.

The fireman testified that he was putting in coal when Barrett began blowing the whistle; that he leaned out of the window and saw the stock—part of them coming on the track, and part running by the side of the track; that Barrett, after first applying the service brake, applied the emergency brake when the stock began to come on the track, and the train came to a standstill about 175 or 200 feet from the trestle.

James Barrett, on being recalled, explained that he meant to say that he blew the whistle 400 or 500 feet (not yards) from the crossing.

W. A. Cummings, who was baggagemaster, testified that he was standing in the door of the baggage car when he heard the danger whistle blow, immediately looked out, saw the colts about to enter on the track, or in the

act of crossing, and felt the brakes applied immediately upon the blowing of the whistle; that it was 260 feet by actual measurement from the place where the train stopped to the trestle.

Wm. R. Ridgway, a witness for plaintiff, who was a passenger in the rear coach, did not see the colts until the train stopped. He testified that the track was straight for about a mile; that he could not tell how long it was before the train stopped that he heard the alarm whistle; that when he got off the engine was stopped, and within 25 or 30 feet of the trestle; that there was water on both sides of the trestle, and the colts that were not injured ran on down the railroad (north) towards Huntsville; that "at the time the alarm whistle was blown that train was running at the usual speed, and ran this way for a while thereafter, and then slacked up."

Henry Strong, a witness for the plaintiff, testified that the engine was 30 or 40 feet from the trestle when it stopped, but he did not measure it, and could not say positively whether the engine had crossed the private road.

Fait E. Drake, a witness for the plaintiff, testified to hearing the whistle; could not testify as to distances, but thought the engine was about 40 feet from the trestle when it stopped, though could not say whether it had crossed the private road.

The first question which presents itself is whether section 5476 of the Code of 1907, which provides when any "stock is killed or injured, or other property destroyed or damaged, by the locomotive or cars of any railroad, the burden of proof, in any suit therefor, is on the railroad company to show compliance with the requirements of such sections, and that there was no

negligence on the part of the company, or its agents," is applicable to this case.

The wording of the section itself shows that it refers to those cases in which stock is killed or injured by coming into collision with the engine or cars; for in a case like the present, if the contention of the plaintiff be sustained, the stock is not killed or injured by the locomotive or cars, but as a consequential result of the negligence of the agents of the defendant in frightening them.

In the state of Indiana, they have a statute fixing an absolute liability upon railroads, where animals are "killed or injured by the locomotives, cars or other carriages of the company;" and the Supreme Court of that state holds that the statute has no application to a case where animals are frightened by the locomotives, etc., and caused to kill themselves.—*Baltimore, P. & Chicago R. Co. v. Thomas*, 60 Ind. 107; *Ohio & Miss. Ry. Co. v. Cole*, 41 Ind. 331; *Peru & Indianapolis R. Co. v. Hasket*, 10 Ind. 409, 71 Am. Dec. 335, and note.

The state of Texas also provided that "each and every railroad company shall be liable to the owner for the value of all stock killed or injured *by the locomotive and cars of such company in running over* their respective railways;" and the Supreme Court of that state holds that the statute applies only to cases of actual collision, and not to cases where animals are injured through fright caused by the train.—*Railway Company v. Hughes*, 68 Tex. 290, 4 S. W. 492; *Texas & P. Ry. v. Mitchell* (Tex. App.) 17 S. W. 1079.

The statutes of Tennessee provided that when any animal or other obstruction appears on the track "the alarm whistle shall be sounded, the brakes put down, and every possible means employed to stop the train,

and prevent the accident;" also, by another statute, that every railroad company that fails to observe these precautions "shall be responsible for all damages to persons or property, occasioned by, or resulting from any accident or collision that may occur;" and by another that, "where a railroad company is sued for killing or injuring stock, the burden of proof that the accident was unavoidable shall be upon the company." The Supreme Court of that state holds that "the injuries to persons and property provided against were injuries produced by the train, and not injuries which stock might inflict upon themselves in the fright occasioned by the running of the trains in the legitimate exercise of the company's franchise."—*Holder v. Railroad,* 11 Lea. 176, 181.

The reasoning of the foregoing decisions is satisfactory to us, and we hold that section 5476 of the Code of 1907 has no application to this case.

It may be stated as a general proposition that a railroad company has a right to operate its trains in the usual manner, making such noise as is incident to the proper conduct of the business, and is not liable for the consequences of fright to animals, unless its servants are negligent, by using its whistles, bells, etc., in an unusual or improper manner; and, "where animals are frightened merely by the approach of trains, the company will not be liable, in the absence of any negligence in the operation of the train, or failure to exercise ordinary care to avoid the injury; but it will be liable if the fright of the animal was due to the train operated in a negligent manner, or if, after discovering the fright and danger of the animal, the injury could, by the exercise of ordinary care, have been avoided."—33 Cyc. 1166, 1167; *N. O. & N. E. R. Co. v. Thornton,* 65 Miss. 256, 3 South. 654.

Where a horse broke his tether, came on the track, and ran ahead of the train, jumped into a trestle, and was killed, and the train did not stop immediately, but stopped before reaching the trestle, it was held that the company was not liable.—*Ga. Pac. Ry. v. Money* (Miss.) 8 South. 646.

Where animals were seen running along a road parallel to the track, and the engineer, after blowing the regular crossing signal, also sounded the cattle alarm to frighten them away, which proved ineffective as to one, which ran across the track and into a fence, the Supreme Court of Georgia held that, there being no unusual and improper noise made, the company was not liable.—*Southern Railway Co. v. Puryear*, 2 Ga. App. 75, 58 S. E. 206.

Where a horse strayed upon the track, and the engineer let off steam to frighten it away, which caused the animal to run into a winged fence extending across the track, the Supreme Court of Arkansas held the company not liable.—*St. L. S. W. Ry. Co. v. Conger*, 84 Ark. 421, 105 S. W. 1177.

In another case, where a horse straying on the track became frightened and ran into a wire fence, badly out of repair, on the right of way, the same court held the company not liable, saying: "But appellant did owe to appellee the duty, when it discovered his colt upon its track, to use ordinary or reasonable care to avoid injury to it by running its train against it, or by frightening and driving it by unnecessary alarms against the wire fence."—*Railway Co. v. Ferguson*, 57 Ark. 16, 20 S. W. 545, 18 L. R. A. 110, 38 Am. St. Rep. 217, 221.

In our own court, in a case where a horse attached to a buggy, at a public crossing, became frightened at the noises or movements of the train and ran away, it was held that the company was not liable, unless the

acts of the servants of defendant were wanton and malicious, and done in the discharge of duty by wanton whistling of the engine and reckless discharge of steam. —*Stanton v. L. & N. R. Co.*, 91 Ala. 383, 386, 8 South. 798; *L. & N. R. Co. v. Lee*, 136 Ala. 182, 33 South. 897, 96 Am. St. Rep. 24; *Southern Railway Co. v. Crawford*, 164 Ala. 179, 185, 51 South. 340.

In another case this court states: 'On the evidence before them, it was open to the jury to find that defendant's train was being moved forward toward a trestle; that plaintiff's horse was on the track between the engine and the trestle, running, in apparent fright of the train, toward the trestle; that the track along which the horse ran was on an embankment 5 or 6 feet high, the sides of which, while not 'precipitous,' were yet at such an incline as that a horse, in attempting to go down them, would partially slide; that the train was from 30 to 50 yards behind the horse, and going faster than he was—'gaining on him'; that the engineer was aware of the situation, but did not seasonably stop or check the speed of his train; that, had he done so, the horse would not have continued his flight onto and into the trestle, and the injury to the animal would have been averted." On those facts the court held the general charge in favor of the defendant properly refused; that the engineer owed the plaintiff the duty of stopping the train; and that "if he negligently failed to discharge this duty, and in consequence the horse was injured, the defendant is liable."—*A. G. S. R. Co. v. Hall*, 133 Ala. 362, 366, 32 South. 259, 260.

From these decisions of our own court, in connection with the decisions of other courts, we extract the principle that, as to the initial fright, the company is not liable, unless the acts of the servants of defendant were wanton and malicious; but after the animal is on the

track, frightened, and running under conditions that indicate that, unless the train is stopped, it will run into the trestle, and that the danger may be averted by stopping the train, a duty arises to stop it; and if the engineer negligently fails to do so the company will be liable.

The testimony of the only eye-witness shows, not only that he did not wantonly and maliciously make any unusual noise before the animals came on the track, and did not negligently fail to use the means of stopping the train after they got on the track, but shows affirmatively that as soon as he saw them approaching the track he used proper means to frighten them back, and commenced at once to use means to stop the train, and, according to the testimony of all the witnesses, he did stop the train at a distance variously estimated at 25, 30, 40, or 225 feet from the animals and the trestle.

There is nothing to show that the animals could not have run off from the track; it being merely stated that the track was on a fill of 1½ or 2 feet, through a marshy place, with water on both sides. Some of the witnesses place the fill at 6 feet at the place where the accident occurred, but not at the place where the colts entered on the track; and one witness states that the water on one side of the track or right of way was about 6 feet deep, but how far this water was from the track is not shown, except by the facts that the right of way is 100 feet wide, and colt tracks are described on both sides of the track, between it and the water, showing that there was a space between; and another witness states that the animals which were unhurt did avoid the trestle, and ran on down the road towards Huntsville.

There is no testimony tending to show that the engineer negligently failed to use the means to stop the

train after the animals were on the track, and running down it, frightened.

It is contended in the brief of appellee that the-witness Ridgway stated that the train continued to run at its usual speed after the alarm whistle was sounded, and that the jury might well find that the perilous position of the animals was in plain view for more than half a mile, and he negligently failed to get his train under control, to slacken the speed, or try to stop until it was too late.

In reaching a conclusion in this case, it must be remembered that the claim is not for running against or over the stock, but simply for frightening them.

As to the engineer's seeing the stock when a half mile distant, there is not any evidence tending to show that. The witness Barrett stated at first that when he first saw them he was 500 yards distant (which would be less than a third of a mile) ; but he came back on the stand to explain that he intended to say *feet* in place of yards. At that time they were at the gate, in a playful mood, and the engineer was not called on to do anything, although he testifies that he did, according to his custom, blow the whistle once, which usually drove animals away, and as soon as he saw them start towards the track he commenced using the means to stop the train. Even then, starting towards the track would not indicate running down the track in front of the train.

The witness Ridgway says that he cannot say how long before they got to the trestle it was when he heard the alarm whistle blown; that he heard the whistle, "and the train ran some little distance before it came to a stop." "It ran this way for a while thereafter, and then slackened up," which does not contradict Barrett and other witnesses, who testify that 200 or 225

feet is as short a space within which the train could be stopped. While he and others state that they estimated the distance from the engine to the trestle, when the train stopped, at from 25 to 40 feet, yet they testify further that they are uncertain whether the engine or the baggage car had passed the private road crossing, which is shown by actual measurement to be 250 feet from the trestle.

We fail to find any evidence tending to show that the engineer was guilty of negligence in not using means to stop the train, after it was apparent that the animals were frightened by the train. It results that the general charge should have been given in favor of the defendant.

The judgment of the court is reversed, and the cause remanded.

Reversed and remanded. All the Justices concur, except McClellan, J., not sitting.