# Garth *v.* Nashville, Chattanooga & St. Louis Ry.

## *Injury to Animals on Track.*

(Decided April 23, 1914. 65 South. 166.)

1. *Railroads; Animals on Track; Injury; Liability.*—As a general rule railroads are not liable for injuries to animals from fright caused by the operation of its train, unless the acts of its servants or agents are wanton or malicious; but, after the animals are on the track, frightened and running under conditions that indicate that the animals will run into a trestle and be injured unless the train be stopped, and that the danger may be averted by stopping the train, the engineer is bound to do so.

2. *Same.*—Where, through no neglect of the company, horses are on the track, and becoming frightened, run along the track and into a trestle, and are injured, the railroad is not liable where the train is stopped before striking them, in the absence of wanton wrong or willful injury upon the part of the servants of the railway.

3. *Same; Killing Stock; Statutes.*—Section 5476, Code 1907, applies only to stock killed or injured in collision with the engine or cars and not the stock killed or injured by negligence in frightening them.

[Garth v. Nashville, Chattanooga & St. Louis. Ry.]

APPEAL from Madison Circuit Court.

Heard before Hon. D. W. SPEAKE.

Action by Winston F. Garth against the Nashville, Chattanooga & St. Louis Railway, for damages for the injury and death of certain horses alleged to have been caused by negligent operation of defendant's train in frightening said animals and causing them to run on a trestle. Judgment for defendant and plaintiff appeals. Affirmed.

SPRAGINS & SPEAKE, for appellant. For the former appeals in this case, see 155 Ala. 311, and 57 South. 640. In the last appeal the court held that defendant was entitled to the affirmative charge. Our contention is that § 5473 applies to cases where animals are frightened and negligently run into a trestle without being actually touched by the train, as well as an animal struck and killed by a train.—*S. & N. R. R. Co. v. Jones,* 56 Ala. 507; *A. G. S. v. Powers,* 73 Ala. 244; *E. T. V. & G. v. Bailey,* 77 Ala. 429; *Wes. Ry. of Ala. v. Sistrunk,* 85 Ala. 358; *K. C. M. & B. v. Watson,* 91 Ala. 486; *Chattanooga Southern v. Daniels,* 122 Ala. 366; *So. Ry. v. Shirley,* 128 Ala. 595; *So. Ry. v. Reaves,* 129 Ala. 457; *C. of Ga. v. Dumas,* 131 Ala. 172. The court erred in giving the affirmative charge as to the fourth and seventh counts. —*M. & O. v. George,* 94 Ala. 199; *Dorsey v. State,* 134 Ala. 553; *So. Ry. v. Shelton,* 136 Ala. 214; *City of Birmingham v. Poole,* 169 Ala. 177; *So. Ry. v. Crawford,* 164 Ala. 178. Counsel discuss other charges given and refused in the light of these authorities with the insistence that the court's action was infected with error.

COOPER & COOPER, for appellee. Most of the questions presented have been decided adversely to appellant on the former appeals in this case.—155 Ala. 311,

and 59 South. 640. Sections 5473 and 5476, Code 1907, have application only to stock struck by a train and not to conditions arising where stock are merely frightened at a train, and injure themselves.—*So. Ry. v. Smith,* 163 Ala. 174; *Ex parte So. Ry.,* 61 South. 88. These sections should be construed as in pari materia.—*N. C. & St. L. v. Wallace,* 164 Ala. 209. The fallacy of appellant's whole argument is demonstrated by the following cases.—*Tanner v. L. & N.,* 60 Ala. 621; *A. G. S. v. Lynn,* 103 Ala. 139; *Bir. So. v. Kendricks,* 155 Ala. 353. The conduct of the engineer comes up to the full measures of the rule announced in *A. G. S. v. Moody,* 90 Ala. 46.

MAYFIELD, J.—Appellant seeks to recover damages for injuries to some colts which ran into a trestle on appellee's railroad. This is the third appeal. See former reports of same case.—155 Ala. 311, 46 South. 583; 179 Ala. 162, 59 South. 640, 46 L. R. A. (N. S.) 430, and extended note. The issues and the facts are fully set forth in these reports of the former appeals.

It was ruled on former appeals, after a full and fair consideration of all of the evidence, that the general affirmative charge should have given for the defendant.

The original counts proceeded upon the theory that the colts were stricken by the train; the amended counts upon the theory of negligence in frightening the colts and thereby running them into the trestle. It is conceded that the colts were not stricken by the train, but were frightened by the approaching train, and ran into the trestle and were thereby injured; some of them being killed outright. So the only contention or dispute on any of the trials was whether or not the engineer or the fireman was guilty of any actionable negligence in frightening the animals, and whether or not the statute

as to blowing whistles, ringing bells, etc., or the statute as to the burden of proof when stock is killed or injured by locomotives or cars, etc., applied to the cause. Both of these questions, the one of fact and the other of law, were decided in favor of the railroad company on the last appeal, and it is earnestly insisted on this appeal that we were in error on the former appeal, and should recede from that position. The insistence is not this in terms; but such is the substance and effect of the argument.

It is true there is some new evidence on this appeal, evidence which was not before the court on the former appeals; but we do not think that it in any way affects the result, or should change the ruling as to whether or not the affirmative charge should have been given.

The following is a correct synopsis of the testimony, and is taken from the brief of appellant:

"The accident occurred shortly before Christmas, 1902, at a point on defendant's road 3 or 4 miles south of Huntsville, where it passes through plaintiff's farm, near a private crossing used by appellant and his tenants and stock in passing from one part of the farm across the track to another part. There is a fence on each side of the right of way, and a gate on either side of the crossing. The right of way at that point is 100 feet in width. The track is on a fill, several feet high, from the crossing north to the trestle, a distance of about 240 feet, and by the side of the fill, on either side, there was water and ice. (Witnesses differed as to whether there was any ice.) The accident occurred about 1 o'clock in the daytime, and the track for several miles south of the crossing and for some distance north of it was straight. The horses came on the track at the crossing and turned north along the track, and several of them were caught in the trestle, and others injured

by the side of the trestle. The train stopped before striking any of them. The front end of the engine, when it stopped, was from 25 to 50 feet south of the animals. From the crossing to the trestle, on both sides of the track, there was water, except immediately at the ends of the cross-ties, where there was a narrow space or track on the roadbed.

"According to the witness Ridgeway, the stock alarm was first sounded when the train was about 200 yards from the trestle, or from the place where the engine finally stopped; that the train continued to go after the alarm signal was given a short distance at its usual speed, and then began to slacken up.

"Harrison Flint, who was not examined at either of the former trials, testified that he, with other section hands, was at work north of the trestle; that, when he first saw the colts, they were on the track at the crossing; that about the same time he saw the train on the hill known as Harris hill, which other evidence showed was 2 miles south of the crossing, the track being straight for that distance; that, after going over Harris' hill, the track went down in a 'swag,' but that the engineer could have seen the colts on the track there for half a mile; that, when the train was near the stock gap south of the crossing, it commenced blowing; that the colts stood there and looked a while after the engineer began blowing, and when he got closer to them they whirled up the track, running north.

"Roger Flint corroborated Harris, but stated further that the engineer blew the whistle when he was about 500 yards from the colts, which were at that time on the track; that, when the train got pretty close to the colts, they commenced running towards the trestle, and that, when the engine stopped, the front part of the engine was 23 or 24 feet from the south part of the tres-

[Garth v. Nashville, Chattanooga & St. Louis. Ry.]

tle that the colts fell in. In another part of his evidence he says it was 17 bar length (a bar being 30 feet long) from the trestle to the stock gap where the train commenced blowing, and that the train was more than 200 or 300 yards from the colts on the track when the whistle blew.

"Elijah Walker, another section hand, testified that, when the train commenced blowing, the colts were on the track, and that at that time the train was something like 500 yards below the crossing; that the colts were on the track 5, 10, or 15 minutes before the train came along. This witness also says that he was three-quarters of a mile from the train, and a quarter of a mile from the colts, when the train began to blow.

"The engineer, Barrett, testified: That he had been running on this track eight or nine years, and was familiar with it. That when he first discovered the colts, he was 500 or 600 feet south of the crossing, and that the colts then were on the east side of the track on the right of way. That he put on the service brake to steady the train and get it under control. That then, after running 40 or 50 feet, he blew the cattle alarm. That the colts came on the track shortly after he sounded the cattle alarm. 'I then put on the emergency brake; I suppose I was 300 or 350 feet from the colts when I put on the emergency brake. * * * I put on the emergency brake I suppose 350 feet south of the crossing, where the colts were coming on the track. They had not become frightened then. The colts started north toward the trestle, which was about 240 feet from the crossing. The colts were going a pretty good gait after they turned down the track from the crossing. They showed alarm then—having first showed alarm when they came on the track after they turned. * * * When I applied the service brake, I was running about 25 or 30

miles an hour. The service brake will check the speed to some extent. The emergency brake is for stopping the train. Traveling at the rate of 25 or 30 miles an hour, I suppose I could have stopped the train in about 500 feet.' That, between the time he applied the service brake and the emergency brake, the speed of the train was checked about 2 miles an hour, and that he could have stopped in a proportionately less distance. That he also reversed the engine and applied the sand. 'The reason I put sand on while I reversed them was so they [the wheels] would hold against the momentum emergency brake, if you then reverse the engine, the tendency of these two acts is to cause the wheels to slip and slide; but, if you put sand on, that keeps them from sliding. I put the sand on that day 300 or 350 feet south of the crossing when the colts began to run north on the track.'

"Solomon, section foreman, testified that the train blowing was what attracted his attention, and that the colts had then gone on the track and were coming toward him (north); when the train blew, they were running northward on the track toward Huntsville; 'when the alarm whistle blew, the colts were on the track and about the track headed in my direction.' "

The decided cases were reviewed on the former appeals, and the distinction was drawn between cases where the engine or cars strike the animals and cases, like this, in which the animals merely become frightened at the train and injure themselves by running into trestles or against objects.

The correct rule as to actionable wrong in such cases was thus stated by SIMPSON, J., on the last appeal: "From these decisions of our own court in connection with the decisions of other courts, we extract the principle that, as to the initial fright, the company is not

liable, unless the acts of the servants of defendant were wanton and malicious; but, after the animal is on the track, frightened, and running under conditions that indicate that, unless the train is stopped, it will run into the trestle, and that the danger may be averted by stopping the train, a duty arises to stop it, and, if the engineer negligently fails to do so, the company will be liable."—179 Ala. 162; 59 South. 642, 46 L. R. A. (N. S.) 430.

Mr. Elliott thus states the rule (Railroads, vol. 3, p. 468): "Where the animals are on the right of way through no neglect of the company, and are injured because of fright or otherwise, the company is not liable unless the injuries were willfully inflicted."

"The principles upon which this case rests have been well settled. It is laid down by Pierce, in his work on Railroads, that: 'The authority to operate a railroad includes the right to make the noises incident to the movement and working of its engines, as in the escape of steam and ratling of cars, and also the right to give the usual and proper admonitions of danger, as in the sounding of whistles and the ringing of bells. It is therefore not liable, while exercising its right in a lawful and reasonable manner, for injuries occasioned by horses, when being driven upon the highway, taking fright at such noises. But, if the injury resulting from the fright would not have happened but for a breach of duty by the company, it will be held liable for the injury.'—Pierce on Railroads, 348. Rorer states the principles to the same effect, and adds: 'But, if the acts of the servants occasioning the fright are wanton and malicious, and be done in the discharge of their business by using the appliances of the company, such as wanton whistling of the engine, and the reckless discharge of steam, the company will be liable.'—Rorer on Railroads,

704 (12)." *Oxford, etc., Co. v. Stedham,* 101 Ala. 376, 378, 379, 13 South. 553, 554.

It must be remembered that in this case there is no contention that the train struck the animals, or that the whistle was not blown, or that there was any excessive blowing or extraordinary noise, or that there was anything approaching wanton or malicious mischief in the frightening of the animals.

There is no evidence tending to show actionable negligence in the failure of the engineer to stop the train after he perceived, or should have perceived, that the animals were not going to leave the track. In fact, as above stated, all the evidence shows that he did stop the train before it reached the animals. And this was all that could be required. As was said on the former appeal, there is nothing to show that the animals could not have run off the track, and the trainmen, therefore, had the right to presume that they would leave the track, and not run down the track into the trestle as they did.

The animals in this case being on the track without fault on the part of the railroad company, and the train not colliding with them, and there being no evidence of wanton wrong or willful injury, there is, and should be, no liability on the part of the railroad company for the injury or for the damages suffered in consequence of the colts' becoming frightened or stampeded, and running into the trestle, instead of leaving the railroad track as they could have done. The whole evidence shows that the injury was due to the nature of the animals, and not to a wrong of the defendant company.

The railroad company is not an insurer against such injuries or damages, but is liable only for the wrongs of its servants or agents, as we have above shown, while acting within the line and scope of their employment

or agency, and where such wrongs proximately contribute to the injuries or damages suffered.

It is earnestly insisted by counsel for appellant that section 5476 of the Code of 1907 is applicable to the facts in this case, and that the burden of proof is by the statute placed upon the railroad company to acquit itself of negligence. It was ruled on the former appeal that this section did not apply to a case like this case, and, after a careful examination of similar statutes of other states, and of the constructions which other courts have placed upon them, we are still of the opinion that this statute does not apply to cases like the one at bar. The statute limits itself to cases in which property is destroyed or damaged by "the locomotives or cars of railroads." The undisputed evidence in this case shows that the property in this case was not destroyed or damaged by locomotive or cars.

The former appeal, 179 Ala. 162, 59 South. 640, is also reported in 46 L. R. A. (N. S.) 430, with an extended note, which cites and reviews the decisions of other courts on this question, and they are uniform to the proposition that statutes similar to the one under consideration do not apply to cases like this, where the animals are merely frightened, and there is no actual collision with them.

The plaintiff proved no liability on the part of the railroad company. While there is some evidence on this trial which was not shown on the others, still there is none which shows, or tends to show, actionable negligence, wanton wrong, or willful injury on the part of the defendant, or of its agents or servants.

The trial court should have given the affirmative charge requested by the defendant. We find no reversible error in this record. If there be any errors as to the charges complained of by the appellant, they were nec-

[Central of Georgia Ry. Co. v. Courson.]

essarily without possible injury to him, for the reason that the trial court should have given the affirmative charge for the defendant.

Affirmed.

ANDERSON, C. J., and SOMERVILLE and GARDNER, JJ., concur.